**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PETER WLOTKOWSKI, MARYANN SLIGAY, ANDREA FREY, CHERYL SIMPSON, MARGARET BURDEN, WAYNE WROBEL, DENNIS LEWIS, SHELLIE DOMALSKI, DAPHNE WINFREY, SEAN MUHLENKAMP, and ANTHONY HOOVER, individually and on behalf of others similarly situated,** | ) ) ) ) ) ) ) ) ) | **CASE NO. 2:09-CV-11898** |
| **Plaintiffs,** | ) ) ) | |
| **vs.** | ) ) | |
| **MICHIGAN BELL TELEPHONE COMPANY,** | ) ) ) | **Honorable Nancy G. Edmunds** **Magistrate Virginia M. Morgan** |
| **Defendant.** | | |

**<u>DEFENDANT MICHIGAN BELL TELEPHONE COMPANY'S</u>**
**<u>MEMORANDUM OF LAW IN OPPOSITION TO</u>**
**<u>PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION</u>**

## ISSUES PRESENTED

1.   Have Plaintiffs submitted sufficient evidence that a class of similarly situated plaintiffs exists to meet the fairly lenient "first stage" standard for conditional certification?

     Defendant's Answer: No.

2.   Should the Court order that judicial notice be sent to putative collective class members?

     Defendant's Answer: No.

3.   Should the Court approve the form of Plaintiffs' proposed judicial notice?

     Defendant's Answer: No.

4.   Should the Court order Defendant to produce to Plaintiffs' Counsel the name, last known address, telephone number, dates of employment, location of employment, date of birth, and employee identification number of each putative collective class member in Microsoft Excel format within seven days of the Court's Order granting this motion?

     Defendant's Answer: No.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION                                                                          1

II.     FACTUAL BACKGROUND                                                          2

        A.      The OSP Manager Job Key Is Comprised Of Four Distinct Positions      2

                1.      Planner                                                              2

                2.      Design Engineer                                                      4

                3.      ROW Engineer                                                        8

                4.      Loop Electronic Engineer                                            9

III.    LEGAL ARGUMENT                                                              9

        A.      Conditional Certification Is Inappropriate Because Plaintiffs And The
                Putative Class Are Not Similarly Situated                            12

                1.      The "similarly situated" standard is not a mere formality      13

                2.      That employees are classified under the same job key or were
                        reclassified is insufficient to establish that they are similarly
                        situated                                                          16

                3.      Significant variation among the Plaintiffs' day-to-day duties and
                        responsibilities makes collective treatment inappropriate        17

        B.      Conditional Certification Is Inappropriate Because Application Of The
                Administrative Exemption Turns On Individual Assessments And
                Complex Factual Determinations                                      19

        C.      Plaintiffs' Proposed Notice Is Deficient                            23

IV.     CONCLUSION                                                                  26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adair v. Wisconsin Bell*,
   No. 08-c-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ................................................14

*Aguirre v. SBC Commc'ns, Inc.*,
   Civ. A. No. H-05-3198, 2007 WL 772756 (S.D. Tex. Mar. 12, 2007)........................10, 17, 20

*Allen v. Marshall Field & Co.*,
   93 F.R.D. 438 (N.D. Ill. 1982)........................................................................................23, 24

*Austin v. CUNA Mut. Ins. Soc'y*,
   232 F.R.D. 601 (W.D. Wis. 2006) ........................................................................................13

*Barnwell v. Corr. Corp. of Am.*,
   No. 08-2151-JWL, 2008 U.S. Dist. LEXIS 104230 (D. Kan. Dec. 9, 2008) .........................25

*Boyd v. Jupiter Aluminum Corp.*,
   No. 2:05-CV-227 PPS APR, 2006 U.S. Dist. LEXIS 35654 (N.D. Ind. May 31, 2006).............
   ........................................................................................................................................13, 24

*Comer v. Wal-Mart Stores, Inc.*,
   454 F.3d 544 (6th Cir. 2006) ................................................................................................13

*Cooke v. Gen. Dynamics Corp.*,
   993 F. Supp. 56 (D. Conn. 1997)...........................................................................................20

*Dolan v. Project Constr. Corp.*,
   725 F.2d 1263 (10th Cir. 1984) *overruled in part by Hoffmann-La Roche*, 493 U.S.
   165 (1989).............................................................................................................................14

*Evancho v. Sanofi-Aventis U.S., Inc.*,
   No. 07-2266 (MLC), 2007 WL 4546100 (D.N.J. Dec. 19, 2007) ....................................17, 20

*Forney v. TTX Co.*,
   No. Civ.A. 05 C 6257, 2006 WL 1030194 (N.D. Ill. Apr. 17, 2006)................................15, 16

*Freeman v. Wal-Mart Stores*,
   256 F. Supp. 2d 941 (W.D. Ark. 2003)...................................................................................15

*Gerlach v. Wells Fargo & Co.*,
   No. C 05-0585 CW, 2006 U.S. Dist. LEXIS 24823 (N.D. Cal. Mar. 28, 2006) ....................24

## TABLE OF AUTHORITIES
(cont.)

**Page(s)**

*Held v. Nat'l R.R. Passenger Corp.*,
101 F.R.D. 420 (D.D.C. 1984)..................................................................................25

*Hipp v. Liberty Nat. Life Ins. Co.*,
252 F.3d 1208 (11th Cir. 2001) ...............................................................................12

*Hoffmann-LaRoche v. Sperling*,
493 U.S. 165 (1989)...............................................................................10, 14, 19, 24

*Johnson v. American Airlines, Inc.*,
531 F. Supp. 957 (N.D. Tex. 1982) .........................................................................25

*King v. ITT Cont'l Baking Co.*,
No. 84 C 3410, 1986 WL 2628 (N.D. Ill. Feb. 18, 1986)...................................23, 24

*King v. West Corp.*,
No. 8:04CV318, 2006 WL 118577 (D. Neb. Jan. 13, 2006) .........................11, 16, 18, 19, 21

*McElmurry v. U.S. Bank Nat'l Ass'n*,
No. CV-04-642-HU, 2005 WL 2078302 (D. Or. July 29, 2005).....................10, 19

*Mike v. Safeco Ins. Co. of Am.*,
274 F. Supp. 2d 216 (D. Conn. 2003) .........................................................11, 16, 20

*Monroe v. United Air Lines, Inc.*,
90 F.R.D. 638 (N.D. Ill. 1981), *rev'd on other grounds*, 736 F.2d 394 (7th Cir. 1984) .........23

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
111 F. Supp. 2d 493 (D.N.J. 2000) .....................................................................10, 11

*O'Brien v. Ed Donnelly Enters., Inc.*,
575 F.3d 567 (6th Cir. 2009) .............................................................1, 9, 11, 12

*Olivo v. GMAC Mortgage Corp.*,
374 F. Supp. 2d 545 (E.D. Mich. 2004)..................................................................13

*Pacheco v. Boar's Head Provisions Co.*,
File No. 1:09-CV-298, 2009 U.S. Dist. LEXIS 112335 (W.D. Mich. Dec. 3, 2009).................

.....................................................................................................1, 11, 13, 14

*Pfaahler v. Consultants for Architects, Inc.*,
No. 99-C-6700, 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000) ............................14, 17

*Reich v. Homier Distrib. Co.*,
362 F. Supp. 2d 1009 (N.D. Ind. 2005) ................................................................19

## TABLE OF AUTHORITIES
(cont.)

**Page(s)**

*Schwed v. G.E.*,
  159 F.R.D. 373 (N.D.N.Y. 1995) ...................................................................23, 24

*Sheffield v. Orius Corp.*,
  211 F.R.D. 411 (D. Or. 2002) .....................................................................10, 19

*Smith v. Heartland Auto. Servs., Inc.*,
  404 F. Supp. 2d 1144 (D. Minn. 2005) ...............................................................16

*Threatt v. CRF First Choice, Inc.*,
  Civ. No. 1:05cv117, 2006 WL 2054372 (N.D. Ind. July 21, 2006) .......................................16

*Watkins v. Milliken & Co.*,
  613 F. Supp. 408 (W.D.N.C. 1984) ....................................................................24

*Woods v. New York Life Ins. Co.*,
  686 F.2d 578 (7th Cir. 1982) ......................................................................15, 24

### STATUTES

29 U.S.C. § 216(b) (2006) ....................................................................9, 12, 13

29 U.S.C. §251(a)(7)...........................................................................14

Portal to Portal Act of 1947 ....................................................................13

§ 251(a), § 1(a) of the Portal to Portal Act of 1947 (2006) .........................................14

### OTHER AUTHORITIES

29 C.F.R. § 541.2 (2009) .......................................................................17

29 C.F.R. § 541.200 ...........................................................................20

29 C.F.R. § 541.200(a)(2) & (3)(2009) .............................................................20

29 C.F.R. § 541.202(b)(2009)....................................................................20

H.R. Rep. No. 71 (1947), *reprinted in* 1947 U.S.C.C.A.N. 1029................................................14

## I.      INTRODUCTION

Conditional certification is not appropriate because Plaintiffs cannot establish, even preliminarily, that they are similarly situated to the putative class members.  They acknowledge that the "Manager, Outside Plant Planning and Engineering Design" ("OSP Manager") job key includes multiple jobs, and the eleven named Plaintiffs have worked in only two of those jobs. Even accepting that Plaintiffs have worked in some of the jobs included in the OSP Manager job key, the variation among their job duties and those of the putative class they purport to represent stands as an obstacle to treating this case as a collective action.  When day-to-day work duties of those in a putative class are materially different in ways relevant to the exemption question, the collective action process is unsustainable.  And that is true in this case.

Plaintiffs' motion presumes, incorrectly, that conditional certification is simply a *pro forma* step.  They rely on boilerplate declarations which, when examined in light of the testimony by Plaintiffs themselves, do not support the picture Plaintiffs attempt to paint of a homogeneous group of employees all performing the same job duties.  Plaintiffs rely on *dictum* from a Sixth Circuit Court of Appeals decisions, rather than any specific holdings from that Court that bear on the factual issues in this case.[1]  Therefore, for the reasons set forth below, Plaintiffs' motion should be denied.

---

[1] *See Pacheco v. Boar's Head Provisions Co.*, File No. 1:09-CV-298, 2009 U.S. Dist. LEXIS 112335, at *8-9 (W.D. Mich. Dec. 3, 2009) ("Although *O'Brien* suggested that FLSA plaintiffs do not have to show a 'unified policy' of violations in order to be found to be similarly situated, this statement is <u>dicta</u> and is not binding on this Court because *O'Brien* ultimately affirmed the district court's decision to decertify the collective action on other grounds. Moreover, *O'Brien* relied solely on *Grayson v. K Mart Corp.*, an ADEA case, in support of this statement, and did not explain its failure to follow cases decided subsequent to *Grayson*, that have required evidence of a class-wide discrimination.") (internal citations omitted).

## II.    FACTUAL BACKGROUND

### A.    The OSP Manager Job Key Is Comprised Of Four Distinct Positions.

Michigan Bell provides customers with local, long distance and wireless telephone service, as well as digital television and internet service.  Declaration of Sharon Dolega ("Dolega Decl."), attached as Exhibit B, ¶ 4.)  "Outside Plant" or "OSP" refers to the various cables, conduits, ducts, poles, towers and other equipment used to deliver the Company's services to customers' premises.  (*Id.*)  The OSP Manager job key is a category that encompasses four separate and distinct positions – Planner, Design Engineer, Right of Way Engineer ("ROW Engineer") and Loop Electronics Engineer[2] – all of which relate to the Company's outside plant facilities, but each of which has a different set of responsibilities relating to those facilities.  (*See* Deposition of Cheryl Simpson ("Simpson Dep.") 14:17-21; Deposition of Dennis Lewis ("Lewis Dep.") 54:7-55:6.)[3]

### 1.    <u>Planner</u>[4]

Planners are responsible for monitoring and managing the OSP "feeder" network, *i.e.* the cables and other facilities running from a Michigan Bell "central office" (the point from which OSP service generates) to a neighborhood "crossbox," which provides service to hundreds of living and commercial units.  (Dolega Decl. ¶ 5; Deposition of Sharon Dolega ("Dolega Dep.")

---

[2] Loop Electronics Engineers are also known as "LECs," which appears throughout the deposition testimony cited in support of this motion.

[3] The relevant portions of all depositions cited herein are attached to the Declaration of Kenneth W. Gage ("Gage Decl."), attached hereto as Exhibit A.

[4] None of the eleven named Plaintiffs are Planners, nor did they work as Planners between May 2006 and May 2009.  (Dolega Decl. ¶ 14.)  The three named Plaintiffs deposed to date admit that they never worked as a Planner.  (Simpson Dep.  15:21-22; Lewis Dep. 56:11-12; Deposition of Shellie Domalski ("Domalski Dep.") 24:11-12.)

19:4-6.)[5]  Planners are assigned one or more "wire centers," geographically-defined areas each containing a Michigan Bell central office.  (Dolega Decl. ¶ 6.)  Planners must monitor their wire centers' existing network capacity (because bandwidth is limited and Michigan Bell needs to ensure that it has sufficient facilities to provide customer service) and anticipate future service needs within their geographic assignments.  (*Id.*; *see also* Dolega Dep. 59:21-24, 60:15-19.)  To this end, Planners review and analyze historical data, existing usage trends and area growth.  (Dolega Decl. ¶ 7; Dolega Dep. 61:13-23.)  Planners also conduct economic analyses to estimate the anticipated cost of new projects and to make decisions regarding technology use, network integration and expansion.  (Dolega Decl. ¶ 8.)  As part of their analyses, Planners identify alternative courses of action and assess the economic impact and feasibility of each.  (*Id.*)

Planners also prepare "handoff packages" containing general layouts for new feeder network projects.  (*Id.* at ¶ 9; Dolega Dep. 40:20-23, 48:15-23.)  As part of the handoff package, Planners draft a written narrative that explains: 1) "What" (what the project will entail), 2) "Where" (where the project will occur), 3) "When" (when the project will occur), and 4) "Why" (why Michigan Bell is doing the project), and 5) "Why this Way" (the Planner's justification for the proposed course of action and the expenditure of company funds).  (*Id.*; *see also* Dolega Dep. 83:23-84:4.)  New feeder network projects require Planners to:

- Identify existing facilities, by studying electronic maps and inventory of Michigan Bell's current network;

- Forecast the designated area's needs into the future, which entails anticipating and analyzing potential residential and/or business growth in the area;

- Take notes, collect job-related data, and conduct field visits as needed to visually assess the area and/or meet with Michigan Bell customers;

---

[5] In some situations, Michigan Bell's cables run directly from a central office to the customer's premises.  (Dolega Decl. ¶ 5.)

3

- Prepare various cost estimates, sketches and schematics using both experience and sophisticated computer programs;

- Make decisions with respect to the type and location of new facilities, including, among other things, whether to use copper or fiber cable (a decision with significant cost implications); and

- Analyze the most cost efficient course of action for Michigan Bell, including how to deliver service at the best price for the Company. While the least expensive option is always a consideration in this process, the Planner must also consider the integrity of Michigan Bell's feeder network, Company strategies, and the quality of service that will ultimately be provided to customers.

(Dolega Decl. ¶¶ 10-11; Dolega Dep. 41:15-25, 46:2-7.)

During the relevant period, Michigan Bell has devoted substantial resources to building its "U-verse" network (a/k/a "Project Lightspeed"), the Company's fiber television and internet service. While many Planners perform the wire center work described above, some have been dedicated to Project Lightspeed. (*Id.* at ¶ 12.) "Transport Planners" are another sub-group of Planners who service major Michigan Bell customers (i.e. large businesses or governmental agencies) by planning customized, high-dollar projects with firm deadlines. (*Id.* at ¶ 13.)

Two Area Managers supervise Michigan Bell Planners. These Area Managers do not supervise any Design Engineers, ROW Engineers or Loop Electronics Engineers. (Dolega Decl. ¶¶ 2-3.)

### 2. Design Engineer[6]

While Planners monitor the feeder network and "plan" new OSP jobs, Design Engineers execute plans and manage the practicalities of delivering service to Michigan Bell customers. (Cicilian Decl. ¶ 3.) As Plaintiff Lewis explained, "The planner would be more like a bird's-eye

---

[6] All but one of the named plaintiffs are Design Engineers. (Declaration of Ron Cicilian ("Cicilian Decl."), attached as Exhibit C, ¶ 17.) Plaintiff Burden is a Loop Electronics Engineer. (*Id.*)

view of a project, and the design engineer does the detailing." (Lewis Dep. 55:18-20.) Each job

requires Design Engineers to make a series of decisions, based on the conditions in the field.

(*See* Lewis Dep. 43:5-14.) Consider this example described by Plaintiff Lewis during his

deposition:

> A.   …I thought it was going to be a very simple job to take a cable from an existing manhole into the building…As it turns out, the splicers told me the manholes need to be rebuilt. I did not expect that, you know, they're the people in the field, and they indicated that they can't do the work that's going to be needed. So, it's a very big challenge for me to try to get these manholes enlarged, if I even can.
>
> * * * * *
>
> Q.   What if you can't enlarge the manholes, then what happens?
> A.   Then I have to – I'll – I'll work with my peers to try to help brainstorm to come up with another solution.
> Q.   What are –
> A.   If I can't come up with one myself.
> Q.   What are some possible solutions in that situation?
> A.   Maybe come from a different direction; maybe build brand new manholes at other locations and build a conduit, new conduit to feed the property from different locations than what I currently have.
> Q.   Why are those not choices that you're considering right now rather than enlarging the manhole?
> A.   Cost would be the first thing, and the other thing is the time element involved to do all that.
> Q.   Because it would be quicker and cheaper to expand the manhole?
> A.   Yes.

(Lewis Dep. 44:4-15, 45:15-46:15.)

Even someone outside the communications industry must appreciate the difference

between *generating* a plan and *implementing* a plan, and Plaintiffs themselves concede that

Planner and Design Engineer are different jobs. (Simpson Dep. 56:13-20; Lewis Dep. 56:5-7.)

Despite having a plan at the outset of implementation, Design Engineers are often confronted

with environmental challenges that compel them to make modifications. (Lewis Dep. 47:19-

48:17.)

It is difficult to summarize a Design Engineer's job duties because at any given time, a

Design Engineer may be responsible for one, all, or a combination of the following:

- Wire Center Work: "Wire Center Design Engineers" are responsible for Michigan Bell's service distribution network within their assigned geographic areas. One responsibility is designing detailed prints for new OSP projects from Planner handoff packages. For example, when a new subdivision, apartment complex, business park or strip mall is constructed ("growth" work), Planners sketch the network from a Michigan Bell central office to a feeder point, then a Design Engineer will analyze and design the actual service distribution from the feeder point to the new development. A number of decisions are associated with each new project, including whether to use copper or fiber cable, whether to bury the cable or use aerial poles, the type and size of cable, and the route of the cable to the particular premises. These projects require Design Engineers to meet and consult with land developers, construction crews and other outside entities. Wire Center work also involves maintaining, rehabilitating and repairing the cable already in the field. This ranges from coordinating the repair of a telephone pole damaged by an auto accident to replacing outdated or worn cable. (Cicilian Decl. ¶ 5.) For example, Design Engineers assigned to metropolitan Detroit are particularly challenged by underground steam from Detroit Thermal that melts Michigan Bell's buried cables and causes service interruptions. (Lewis Dep. 96:10-97:6.)

- Legal Mandate: Some Design Engineers work with local officials to resolve issues arising from government construction projects that may conflict with – that is, physically impact – the Company's existing cable facilities (e.g. Michigan DOT roadwork where Michigan Bell has buried cable). Specifically, a Design Engineer collaborates and negotiates with the government agency to develop an agreeable solution, which could be a project re-design (to avoid the conflict altogether), or Michigan Bell relocating its equipment with reimbursement from the government. It is the Design Engineer who ultimately decides whether or not to relocate the existing facilities. (Lewis Dep. 58:17-59:11.) Design Engineers are proactive about identifying legal mandate projects, monitoring city council measures and reviewing meeting agendas. Designers may represent Michigan Bell at public meetings and hearings to explain projects, address concerns, and resolve issues in a way that satisfies the Company's service goals and objectives. While it's possible for a Planner to be involved in major legal mandate projects, often Design Engineers handle legal mandate jobs independently. (Cicilian Decl. ¶ 6.)[7]

- Held Orders: When a resident places an order for new telephone service and there has been no pre-existing service at that location, a Design Engineer must analyze the network to

---

[7] Plaintiffs Simpson and Domalski, both of whom are Design Engineers, have never performed legal mandate work. (Simspon Dep. 48:20-22; Domalski Dep. 31:17-18.)

determine how to most efficiently provide service.  These assignments often do not require any field time.  (Cicilian Decl. ¶ 7.)[8]

- DS1 Service: These are high-speed, customized service requests.  A group of Design Engineers are dedicated to this type of work and do not typically perform other Design Engineer tasks.  (Cicilian Decl. ¶ 8.)

- Joint Use:  Michigan Bell sometimes places cable on aerial facilities owned by other entities, such as utility companies.  Joint Use Design Engineers coordinate work on these shared poles and serve as a liaison between Michigan Bell and the outside entities.  (*Id.* at ¶ 9.)

- Cell Site: Some Design Engineers detail the connection of cables (typically, fiber) from a feeder point to a cell service tower.  There has been a significant increase in this build during recent years.  (*Id.* at ¶ 10.)

- Project Lightspeed: Some Design Engineers are responsible for designing the distribution of U-verse (television and internet) service to residential customers.  Design Engineers assigned to Project Lightspeed occupy one of two sub-groups:  1) VRAD Designers, who determine the placement and power source for U-verse cabinets after field visits and negotiations with municipalities, property owners and power companies, or 2) F2 Conditioning Designers, who prepare work prints related to the U-verse distribution design.  (*Id.* at ¶ 11.)

All of the tasks and decisions described above are driven by cost considerations (*See*

Simpson Dep. 61:22-62:7, 118:16-119:8; Lewis Dep. 36:1-22, 47:1-14), and as Plaintiff Lewis

testified, these costs are significant to Michigan Bell:

Q.      You just answered that you make on-the-spot decisions in your job.  Do you
         consider the decisions you make to be significant decisions?
A.      Yes.
Q.      What – what in your opinion makes them significant?
A.      Well, is that I'm in the process of – of designing a job that's going to cost
         thousands of dollars.  I think that's significant in itself and the judgments and
         decisions that I make will affect the cost to the company.

(Lewis Dep. 83:15-84:4.)

---

[8] Plaintiff Domalski's workload consists exclusively of resolving held orders.  (Domalski Dep. 37:14-19.)

LEGAL_US_W # 63944098.9

3. **ROW Engineer**[9]

ROW Engineers are responsible for acquiring and maintaining rights of way for Michigan Bell's facilities on privately owned property and land controlled by local, city, county, state, and federal agencies. (Malacara Decl. ¶ 3.) The ROW Engineers' functions include:

- Obtaining specifications from other OSP Managers to determine what equipment needs to be placed in the area at issue. (Malacara Decl. ¶ 4.)

- Researching property records to determine whether the Company already has an easement and, where it does not, identifying the owner of the property at issue. This research includes locating and analyzing parcel and survey maps, searching microfiche records, and obtaining and reviewing tax assessor records, deeds, contracts, wills, and title reports. (Malcara Decl. ¶ 5.)

- Selecting the site for the easement – which involves considering issues such as size, space, power availability, regulations, safety, and aesthetic considerations – and, if determined appropriate or beneficial, identifying alternative sites. (Malacara Decl. ¶ 6.)

- Negotiating with the property owner to obtain consent for the easement, at the best possible price within the approved budget. In addition to price, ROW Engineers negotiate issues such as placement of equipment and remediation costs (such as landscaping the property and whether to construct retaining walls or fences). (Malacara Decl. ¶ 7.)

- Preparing legal descriptions of the property, quitclaim deeds and other documents related to securing an easement. (Malacara Decl. ¶ 8.)

ROW Engineers are also responsible for protecting the Company's existing easements when construction is planned or occurring in an area where Michigan Bell has easement rights. (Malacara Decl. ¶ 9.) In such instances, the ROW Engineers gather all relevant information and work with outside parties to ensure that the Company's rights are not impacted. (*Id.*)

---

[9] None of the eleven named plaintiffs are ROW Engineers, nor did they work as ROW Engineers between May 2006 and May 2009. (Declaration of Esther Malacara ("Malacara Decl."), attached as Exhibit D, ¶ 10.) The three named Plaintiffs deposed to date admit that they never worked as a ROW Engineer. (Simpson Dep. 16:1-3; Lewis Dep. 56:13-15; Domalski Dep. 24:13-16.)

8

### 4. **Loop Electronic Engineer**

Plaintiff Simpson, who worked as a Loop Electronics Engineer during the alleged limitations period, agrees that the job is unlike any other position in the OSP Manager job key. (Simspon Dep. 27:10-21, 28:13-16, 29:4-21.)  A Loop Electronics Engineer is responsible for, among other things, securing the actual equipment necessary to deliver Michigan Bell service. (Cicilian Decl. ¶ 12.)  Typically, this requires the Loop Electronics Engineer to make field visits to assess the area and often meet with Michigan Bell customers to discuss equipment selection and placement.  (*Id.* at ¶ 13.)  Sometimes a Planner or Design Engineer designates the preferred equipment selection, but it is not uncommon for a Loop Electronics Engineer to make alternate recommendations after visiting the site, consulting with customers and assessing available power sources.  (*Id.* at ¶ 14.)  They work with outside vendors to order equipment.  (*Id.* at ¶ 15.)  Loop Electronics Engineers also schedule equipment installation and coordinate quality checks to test new installations.  (*Id.* at ¶ 16.)

## III.   LEGAL ARGUMENT

A collective action under Section 216(b) of the Fair Labor Standards Act should be sustained only when the employees in the putative collective class are "similarly situated" to one another.  29 U.S.C. § 216(b) (2006).  Neither the Supreme Court nor the Sixth Circuit Court of Appeals has defined the phrase "similarly situated."  In the decision upon which Plaintiffs rely heavily, the Sixth Circuit took care to state that it did "*not purport to create* comprehensive criteria for informing the similarly-situated analysis . . ."  *O'Brien v. Ed Donnelly Enters., Inc.,* 575 F.3d 567, 585 (6th Cir. 2009).  So the court should look to the purposes of the collective action procedure and its legislative history to evaluate Plaintiffs' motion.

9

The collective action procedure exists to permit the "efficient resolution of [material] common issues of law and fact." *Hoffmann-LaRoche v. Sperling*, 493 U.S. 165, 170 (1989).  In other words, collective treatment may be appropriate when a comparatively small number of witnesses can testify and provide representative proof about the day-to-day duties and responsibilities of a larger group of employees allegedly misclassified by their employer.  In theory, where there is homogeneity among class members, the fact-finder can determine, based on the testimony of the representative employees, whether the group as a whole is entitled to compensation, without hearing from each member of the collective class.  If the day-to-day work duties of those in the putative class are materially *different* in ways relevant to the exemption question, however, the "collective action" process is unsustainable.  *See Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) ("an action dominated by issues particular to individual plaintiffs cannot be administered efficiently because individual issues predominate over collective concerns"); *Aguirre v. SBC Commc'ns, Inc.*, Civ. A. No. H-05-3198, 2007 WL 772756, at *12 (S.D. Tex. Mar. 12, 2007) ("In cases with . . . variability among the members of the putative class of allegedly misclassified employees, courts have refused to certify the case for collective treatment because an individual inquiry into each plaintiff's job duties is required."); *McElmurry v. U.S. Bank Nat'l Ass'n,* No. CV-04-642-HU, 2005 WL 2078302, at *18 (D. Or. July 29, 2005) ("factual differences may undermine the judicial efficiency which a collective action is designed to promote").

In an alleged misclassification collective action, the "similarly situated" question "must be analyzed in terms of the nature of the job duties *performed by each class member*, as the ultimate issue to be determined is whether each employee was properly classified as exempt." *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (emphasis

added); *see also King v. West Corp.*, No. 8:04CV318, 2006 WL 118577, at *14 (D. Neb. Jan. 13,

2006) ("Since the ultimate issue to be determined in this case is whether West properly classified

[the employees] as exempt, deciding whether members of this proposed class are 'similarly

situated' requires analyzing the nature of the job duties performed by each putative plaintiff.").

When disparities between the putative class employees' day-to-day duties exists, "[t]o determine

which employees are entitled to overtime compensation[,] … [the fact-finder must undertake] an

individual, fact-specific analysis of each employee's job responsibilities under the relevant

statutory exemption criteria." *Morisky*, 111 F. Supp. 2d at 498.  The necessity of such

individualized analysis makes misclassification cases in which the putative class members'

duties differ ill-suited for collective action.  *Id.*; *see also Mike v. Safeco Ins. Co. of Am.*, 274 F.

Supp. 2d 216, 220 (D. Conn. 2003) (denying conditional certification because "[d]etermining

whether an employee is exempt from the FLSA's overtime requirement is extremely individual

and fact-intensive, requiring a detailed analysis of the time spent performing administrative

duties, and a careful factual analysis of the full range of the employee's job duties and

responsibilities") (internal quotation omitted); *King*, 2006 WL 118577, at *14 (denying

conditional certification because the determination of whether employees were properly

classified as exempt required "an individual, fact-specific analysis of each employee's job

responsibilities under the relevant statutory exemption criteria").

   Plaintiffs' argument that *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567 (6th

Cir. 2009) requires a different analysis should be rejected for four separate reasons:

- First, the language in *O'Brien* on which Plaintiffs' rely is *dictum.  See Pacheco,* 2009 U.S.
  Dist. LEXIS 112335, at *8-9.

- Second, the language in *O'Brien* on which Plaintiffs' rely is wrong.  *Id.*  If one reads the
  *O'Brien* dictum as requiring district courts to try all opt-in claims on an individualized
  basis as long as they are based on a common theory of defendant's violation, that standard

11

is contrary to overwhelming authority, flies in the face of clear congressional intent, and is utterly impractical.[10]  *Id.*  (citing *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001)) for the proposition that "while a unified policy, plan, or scheme may not be required, the plaintiff must still demonstrate class-wide discrimination").

- Third, the *O'Brien* dictum is completely impractical.  Requiring individualized consideration of each opt-in's particular claim may be feasible in a case like *O'Brien* with eight opt-ins.  But it is simply not feasible in a collective action that may include scores of opt-ins, each requiring his or her own mini-trial to assess whether the distinct job duties he or she performed met the administrative exemption requirements.

- Fourth, the *O'Brien* dictum does not apply to this stage of the litigation.  It suggests only a standard for trying cases; it does not address or alter the established standard for when it is appropriate for a district court in the exercise of its discretion to authorize notice.

In this action, Plaintiffs request conditional certification of a class of all persons who are or were employed by Michigan Bell as a "Manager, Outside Plant Planning and Engineering Design in the state of Michigan within three years of the date that the Court issues an order granting conditional certification to May 16, 2009."  (Plaintiffs' Motion for Conditional Certification and Judicial Notice [Doc. No. 58] at p. 1.).  Plaintiffs, however, cannot establish that they are similarly situated to the putative class members.  On the contrary, Plaintiffs' claims are inappropriate for collective treatment in light of the different positions at issue and the individualized nature of employees' duties.

### A.     Conditional Certification Is Inappropriate Because Plaintiffs And The Putative Class Are Not Similarly Situated.

The FLSA permits an individual to assert legal claims on behalf of herself and "similarly situated" employees.  *See* 29 U.S.C. § 216(b).  Although courts have discretionary power to

---

[10] The *O'Brien* dictum justified this extraordinary departure by purporting to rely on "the remedial purpose of the collective action device."  575 F.3d at 586.  But this ignores the clear legislative history of the Portal-to-Portal Act discussed more thoroughly below, which demonstrates that the opt-in collective action was created by Congress not to greatly expand collective actions as a remedial device, but instead to protect employers from the "tremendous financial burden" associated with "excessive and needless litigation."  The dictum thus rests on a conception of Congressional intent that is wholly chimerical.

12

authorize the sending of notice to potential class members in a collective action brought under § 216(b), this discretion may be exercised only in "appropriate cases." *Hoffmann-La Roche, Inc.,* 493 U.S. at 169.  District courts in the Sixth Circuit have adopted a "two-tiered approach" to determine whether certification of a collective class is warranted.  *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 547-48 (E.D. Mich. 2004); *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).  In the first step, the plaintiff must show that he or she is similarly situated to potential class members.  *Id.*  If the plaintiff succeeds in making this showing, the court may, in its discretion, conditionally certify the class and allow notice to issue to putative class members.  *Id.*  In the second step, the defendant may make a motion to decertify the class following discovery on the alleged class claims.  *Id.*

### 1.    The "similarly situated" standard is not a mere formality.

Plaintiffs have not met their burden in showing that they are "similarly situated."  While this initial "similarly situated" inquiry is lenient, the standard "is not a mere formality."  *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605-06 (W.D. Wis. 2006); *Boyd v. Jupiter Aluminum Corp.,* No. 2:05-CV-227 PPS APR, 2006 U.S. Dist. LEXIS 35654, at *9 (N.D. Ind. May 31, 2006); *see also Pacheco*, 2009 U.S. Dist. LEXIS 112335, at *5 (noting that the Court has "a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted") (internal quotations and citations omitted).  An evidentiary basis for the "modest showing" is essential to remain true to Congress' intent in adopting the Portal to Portal Act of 1947.

The "similarly situated" language of the FLSA was part of the original 1938 Act, which broadly permitted representative and collective actions for a variety of wage and hour practices. The substantive provisions of the Act, as interpreted by the Supreme Court, led to a flood of

litigation and "unexpected liabilities, immense in amount and retroactive in operation" for employers. 29 U.S.C. § 251(a), § 1(a) of the Portal to Portal Act of 1947 (2006). "Perceiving the flood of litigation as a serious threat to interstate commerce the Congress *moved to limit …* the class action procedures for filing [collective] actions" by adding the FLSA's opt-in procedure via the adoption of the Portal to Portal Act in 1947. *Dolan v. Project Constr. Corp.*, 725 F.2d 1263, 1266-67 (10th Cir. 1984) (emphasis added) *overruled in part by Hoffmann-La Roche*, 493 U.S. 165 (1989). In doing so, Congress specifically sought to address the 'tremendous financial burden' placed upon employers from the "excessive and needless [collective action] litigation" the Act had spawned. 29 U.S.C. §251(a)(7); *see* H.R. Rep. No. 71 (1947), *reprinted in* 1947 U.S.C.C.A.N. 1029, 1032.

Courts do not accept "mere allegations" that a plaintiff is similarly situated without supporting evidence. *See*, *e.g.*, *Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700, 2000 U.S. Dist. LEXIS 1772, at *6 (N.D. Ill. Feb. 8, 2000) (insufficient evidence where plaintiff had no personal knowledge of "the work other [putative class members] performed, the circumstances under which work was performed, or the circumstances of potential claimants"); *Adair v. Wisconsin Bell*, No. 08-c-280, 2008 WL 4224360, at *6 (E.D. Wis. Sept. 11, 2008) (denying conditional certification because "conclusory allegations" and "unsupported assertions of widespread violations" are insufficient "to make even the modest factual showing required) (internal citations omitted). Where, as here, the party opposing conditional certification presents evidence refuting or undermining the plaintiff's claims, district courts conduct a more thorough examination of the plaintiff's allegations. *See*, *e.g.*, *Pacheco*, 2009 U.S. Dist. LEXIS 112335, at *5 ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action

14

because the class members are not similarly situated.") (quoting *Freeman v. Wal-Mart Stores*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)); *Forney v. TTX Co.*, No. Civ.A. 05 C 6257, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) (denying plaintiff's motion for conditional certification, even under the "lenient" standard, because she failed to prove other employees were similarly situated); *Woods v. New York Life Ins. Co.,* 686 F.2d 578, 581 (7th Cir. 1982) (acknowledging that discovery demands upon conditional certification may impose "a tremendous financial burden to the employer").

Here, Plaintiffs have presented cookie-cutter declarations that suggest that all employees in the OSP Manager job key perform the same work.  The three Plaintiffs deposed to date confirm, however, that the job key is comprised of different positions, each with different duties. (Simpson Dep. 14:17-15:11, 15:21-16:5, 27:10-21, 56:13-57:8; Lewis Dep. 54:7-55:6, 56:5-17; Domalski Dep. 24:3-16.)  Significantly, during her deposition, Plaintiff Simpson even retracted the job description she provided in her signed interrogatory responses and testified that it did <u>not</u> depict the duties and responsibilities associated with the Loop Electronics Engineer position, the job she held during part of the alleged limitations period.  (Simpson Dep. 144:17-145:16.)  She specifically distinguished the provided job description as belonging only to the Design Engineer job and not the Loop Electronics Engineer job.  (*Id.*)  Moreover, none of the Plaintiffs even worked as a Planner or ROW Engineer during the limitations period (jobs plaintiffs admit are distinct and have entirely different responsibilities from their own), so how could they have first hand knowledge of the daily duties associated with those jobs?[11]  (Dolega Decl. ¶ 14; Malacara

---

[11] Plaintiffs argue in note 5 of their memorandum that the court should certify subclasses, if it accepts Michigan Bell's argument (supported by the undisputed facts) that the OSP Manager job key includes different jobs.  They do not, however, explain how Plaintiffs could legitimately seek to represent individuals who work in jobs the Plaintiffs themselves have never worked in.

LEGAL_US_W # 63944098.9

Decl. ¶ 10.)  These facts completely undermine Plaintiffs' boilerplate declarations and show that the positions within the OSP Manager job key are not "similarly situated."

<strong>2.      That employees are classified under the same job key or were<br>reclassified is insufficient to establish that they are similarly situated.</strong>

The fact that Plaintiffs and the putative class members are classified under the same job key does not establish that they are similarly situated.  Nor does the fact that Michigan Bell reclassified them at the same time.  The similarity of employees' job descriptions or job titles, let alone job category, is not adequate proof that the employees are similarly situated.  *King*, 2006 WL 118577, at *14 ("The members of the proposed opt-in class have the same job title, and essentially the same job description [but] employees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially."); *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) ("Plaintiffs may not rely on the job description itself as generalized evidence that they are mis-classified as exempt employees"; "[i]t is only once [the Court considers] the Plaintiffs' testimony as to the degree to which other tasks are performed that the application of the exemption becomes an issue.").  The inquiry of whether employees are similarly situated instead depends on the actual day-to-day duties each performs.  *Forney*, 2006 WL 1030194, at *3 (denying conditional certification after explaining that "plaintiff's reliance on job descriptions is unpersuasive").  Whether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions."); *Threatt v. CRF First Choice, Inc.*, Civ. No. 1:05cv117, 2006 WL 2054372, at *13 (N.D. Ind. July 21, 2006) ("[A]ctual facts govern the relevant analysis, not mere policies and procedures. Whether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions."); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn.

16

2003) ("Regardless of the possibility that another employee's 'primary duties were [the same]' any other plaintiff would also have to present specific evidence of his or her daily tasks, and the court would have to apply the [administrative exemption] regulations on an individual basis. Further, in order to determine membership in the class [plaintiff] identifies . . ., the court would have to engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or her job responsibilities were similar to [plaintiff's].  As such, [plaintiff] has not presented a firm basis for the court to identify similarly situated individuals and has failed to meet his burden under the FLSA."); *see also* 29 C.F.R. § 541.2 (2009) ("A job title alone is insufficient to establish the exempt status of an employee.").

### 3.   <u>Significant variation among the Plaintiffs' day-to-day duties and responsibilities makes collective treatment inappropriate.</u>

Collective action is only appropriate when the employees in the putative class perform the same duties as the plaintiffs.  *See Pfaahler*, 2000 WL 198888, at *3 (only where those in the pool of potential claimants perform the same duties as the plaintiff is a collective action proper). Courts regularly hold that "employees [even] with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially." *Aguirre*, 2007 WL 772756, at *12 (denying collective certification of class of employees with the same job title, explaining that plaintiffs must be similarly situated in the "kind of duties they had, the amount of time they spent on these duties, and the extent of the discretion they exercised"); *see also Evancho v. Sanofi-Aventis U.S., Inc.*, No. 07-2266 (MLC), 2007 WL 4546100, at *3 (D.N.J. Dec. 19, 2007) (denying plaintiffs' motion for conditional certification, explaining, "Employees' status under the FLSA may vary, even if they have the same job title, if their job responsibilities and duties differ among each other…[S]uch differences are relevant to the statutory criteria of the FLSA exemptions.")

17

*King v. West Corp.* is instructive. 2006 WL 118577. In *King,* the court denied conditional certification where a class of "order specialists," comprised of Voice Services Managers (VSMs) and Data Services Managers (DSMs), claimed they were misclassified. *Id.* at *1. The *King* court held that "[t]he members of the proposed opt-in class have the same job title, and essentially the same job description[] [but] employees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially." *Id.* at *14. Similar to the OSP Managers at issue, "not all VSMs and DSMs perform exactly the same job . . . [and] some VSMs and DSMs are members of specialized teams [engaged in different duties] . . . and different procedures may be required for wholesale as opposed to retail or local business order." *Id.* at *3. As is the case here, "[t]he specific job tasks and level of responsibility accepted by DSMs and VSMs may vary based on the type of team they work on, their training and level of experience, and the Area Manager assigned to the team, and the AT&T customer for whom they work." *Id.* at *8. Thus, the *King* court held that class certification was inappropriate because the determination of whether employees were properly classified as exempt required "an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." *Id.* at *14 (internal quotation omitted).

Here, Plaintiffs admit that the subject job key is comprised of *different* positions, each with *different* duties. (Simpson Dep. 14:17-15:11, 15:21-16:5, 27:10-21, 56:13-57:8; Lewis Dep. 54:7-55:6, 56:5-17; Domalski Dep. 24:3-16.) The named Plaintiffs cannot represent the four positions comprising the OSP Manager job key because no Plaintiff worked as a Planner or Right of Way Engineer during the limitations period. (Dolega Decl. ¶ 14; Malacara Decl. ¶ 10.). Moreover, as Michigan Bell has shown, there exist significant variations within the Planner and

18

Design Engineer positions.  (*See* Dolega Decl. ¶¶ 12-13; Cicilian Decl. ¶¶ 4-11.)  For these

reasons, the eleven Plaintiffs are not similarly situated to one another, let alone the scores of

putative class members whom they seek to represent.  Like the VSMs and DSMs in *King*, the

OSP Managers' duties vary, necessitating individual analysis of each employee's exempt status,

and making class certification inappropriate.  *Id.*; *see also Reich v. Homier Distrib. Co.*, 362 F.

Supp. 2d 1009, 1015 (N.D. Ind. 2005) ("individual discovery required … would destroy the

economy of scale envisioned by the FLSA collective action procedure") (internal quotations and

citations omitted).

        **B.**     **Conditional Certification Is Inappropriate Because Application Of The Administrative Exemption Turns On Individual Assessments And Complex Factual Determinations.**

Analysis of an employee's exempt or non-exempt status under the FLSA is a highly fact-

intensive inquiry.  Yet, the purpose behind a collective action is to promote judicial efficiency by

allowing common issues to be tried together.  *Hoffmann-LaRoche*, 493 U.S. at 170; *Sheffield*,

211 F.R.D. at 415.  For this reason, where the very nature of the inquiry requires detailed

individual fact-finding on a claimant-by-claimant or job-by-job basis, such economies are

lacking, and a collective action proves unwieldy.  *Sheffield*, 211 F.R.D. at 413 ("[A]n action

dominated by issues particular to individual plaintiffs can not be administered efficiently because

individual issues predominate over collective concerns."); *McElmurry*, 2005 WL 2078302, at

*18 ("factual differences may undermine the judicial efficiency which a collective action is

designed to promote").

An employee is properly classified as administratively exempt if the "primary duties" of

the employee involve "the performance of office or non-manual work directly related to the

management or general business operations of the employer or the employer's customers," and

"include[] the exercise of discretion and independent judgment with respect to matters of

19

significance."  29 C.F.R. § 541.200(a)(2) & (3)(2009).  The regulations provide a long list of

non-exhaustive factors to consider in determining whether work involves discretion and

independent judgment.  29 C.F.R. § 541.202(b)(2009).  The exemption inquiry requires several

factual determinations:  first, an appraisal of the employee's primary duties; second, a judgment

of whether such duties require the "performance of office or non-manual work directly related to

the management or general business operations;" third, a more complex analysis of whether the

employee exercises actual discretion and independent judgment; and fourth, an evaluation as to if

the discretion and independent judgment is exercised "with respect to matters of significance."

29 C.F.R. § 541.200.  This complex, multi-step determination of an employee's administratively

exempt status is "necessarily fact intensive."  *See, e.g.*, *Cooke v. Gen. Dynamics Corp.*, 993 F.

Supp. 56, 59-61 (D. Conn. 1997) (the analysis of the administrative exemption is "necessarily

fact intensive," "turn[ing] on a careful factual analysis of the full range of the employee's job

duties and responsibilities."); *Aguirre*, 2007 WL 772756, at *12 (to determine if employees are

similarly situated, a court must consider the "kind of duties they had, the amount of time they

spent on these duties, and the extent of the discretion they exercised"); *Evancho*, 2007 WL

4546100, at *3 ("Employees' status under the FLSA may vary, even if they have the same job

title, if their job responsibilities and duties differ among each other…[S]uch differences are

relevant to the statutory criteria of the FLSA exemptions.").

　　　　When the day-to-day duties of a group of putative class employees vary, such a case is

generally not appropriate for collective certification.  *See Mike*, 274 F. Supp. 2d at 220-21

(denying conditional certification because "proof in this [misclassification] case is specific to the

individual," and, "[r]egardless of the possibility that another employee's primary duties were [the

same], any other plaintiff would also have to present specific evidence of his or her daily tasks,

and the court would have to apply the regulations on an individual basis. Further, in order to determine membership in the class [plaintiff] identifies . . . the court would have to engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or her job responsibilities were similar to [plaintiff's].  As such, [plaintiff] has not presented a firm basis for the court to identify similarly situated individuals."); *King*, 2006 WL 118577, at *14 (denying conditional certification because the determination of whether employees were properly classified as exempt required "an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria").

Here, the employee-by-employee inquiry required for the exemption analysis weighs against conditional class certification.  As a first measure, the Court would need to segregate and individually examine all four positions within the OSP Manager job key, two of which (Planner and Right of Way Engineer) have never been held by Plaintiffs.  For example, the exempt status of Planners, who are responsible for the planning and maintenance of the feeder network, forecasting future needs and evaluating different design options for the feeder network, which necessarily implicates different costs to the Company, would have to be considered separately from the exempt status of ROW Engineers, who are responsible for acquiring and maintaining rights of way for Michigan Bell's facilities, which involves, among other things, selecting sites and negotiating with property owners a price for the right of way.  (*See* Dolega Decl. ¶¶ 5-11; Malacara Decl. ¶¶ 3-9.)  Employees in the four subject positions perform distinct functions related to the outside plant.  They have varying degrees of interaction with and negotiations with customers or other outside entities.  All of these are independent considerations when assessing whether the employees exercise independent judgment and discretion on matters of significance.

Further, given the variations *within* each of the four positions, the Court would also be compelled to examine the actual tasks performed by individuals in each position. The workload of two Design Engineers is often very different.   (*See* Cicilian Decl. ¶ 4.)  The exempt status of a Design Engineer who does a substantial amount of Legal Mandate work, which involves negotiation with government entities over the need to relocate Michigan Bell's facilities, representation of the Company at public meetings and potential redesign of the Company's facilities, would have to be considered separately from the exempt status of a Design Engineer who does little to no Legal Mandate work but primarily handles Held Orders.  (*Id.* at ¶¶ 6-7.)

The Court should also consider that each of the three named Plaintiffs deposed to date admit that they work largely independently and without supervision, highlighting the judgment and discretion associated with their positions.  (*See* Simpson Dep. 66:4-8; Lewis Dep. 82:18-83:8; Domalski Dep. 50:6-10.)  When asked what he likes about his job, Plaintiff Lewis testified, "That every job is different.  It's not something that's repetitive job to job.  Every – everything that comes in gives us an opportunity to think, try to come up with a good plan." (Lewis Dep. 24:1-5.)  So, in order to evaluate the exemption test under the FLSA, the Court will need to carefully scrutinize *how* each Plaintiff exercised these "opportunities to think" and *how* Plaintiffs "tried to come up with a good plan."  But, given their distinct job functions, the daily work-related decisions of a Planner cannot fairly be imputed to Design Engineer, ROW Engineer or Loop Electronic Engineer (and vice versa).

Plaintiffs' motion for conditional class certification and proposed notice, if granted, will force the Court and the parties to adjudicate the claims of dissimilar employees, thus, substantially reducing the primary benefit of class actions proceedings – the judicial economy produced by "efficient resolution in one proceeding of common issues of law and fact."

22

*Hoffmann-La Roche,* 493 U.S. at 170.  Instead of reaping economies of scale from conditional certification of a collective action, the Court will be burdened with the task of parsing through disparate jobs, some of which clearly are not similarly situated.  Moreover, the cost and expense Michigan Bell would incur to defend a prematurely conditionally certified class action is significant and unnecessary.

      **C.**      **Plaintiffs' Proposed Notice Is Deficient.**

      Should the Court decide conditionally to certify the case as a collective action, Plaintiffs' proposed notice is deficient in a number of material respects.

      First, Plaintiffs' proposed notice is misleading because it fails to explain to the putative class members their option to retain other counsel or bring an individual lawsuit.  Indeed, notice forms approved often include a statement advising putative class members of their right to counsel of their own choice.  *See Monroe v. United Air Lines, Inc.*, 90 F.R.D. 638, 641 (N.D. Ill. 1981) ("It is entirely your own decision whether or not [to opt-in to the action] and if you do elect to become a party plaintiff, whether you prefer to be represented by the present plaintiffs' attorneys or by an attorney of your choosing."), *rev'd on other grounds*, 736 F.2d 394 (7th Cir. 1984); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438, 449 (N.D. Ill. 1982) ("If you wish to join the suit as a party plaintiff, it is entirely your own decision as to whether you prefer to be represented by the present plaintiffs' attorneys or by an attorney of your own choosing."); *King v. ITT Cont'l Baking Co.*, No. 84 C 3410, 1986 WL 2628, at *6 (N.D. Ill. Feb. 18, 1986) ("it is entirely your own decision as to whether you prefer to be represented by the present plaintiffs' attorneys or by an attorney of your own choosing"); *Schwed v. G.E.*, 159 F.R.D. 373, 379 (N.D.N.Y. 1995) (same).

Second, the styling of Plaintiffs' notice reasonably could be perceived by a non-lawyer as judicial endorsement of Plaintiffs' claims.  The Supreme Court has cautioned courts to avoid "even the appearance" of any judicial sponsorship of plaintiffs' claims.  *Hoffmann-La Roche*, 493 U.S. at 174; *see also Woods*, 686 F.2d at 582 (vacating authorization of notice because the notice, among other things, included signature of judge and, therefore, connoted judicial sponsorship).  Plaintiffs have included, at the end of their proposed notice, a statement that "[t]he Court has made no decision in this case about the merits of Plaintiffs' claims or Defendant's defenses."  This statement should be included on the first page of the notice.  *See Boyd*, 2006 U.S. Dist. LEXIS 35654, at *18 (requiring disclaimer to be moved to first page of notice); *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 U.S. Dist. LEXIS 24823, at *13 (N.D. Cal. Mar. 28, 2006) (plaintiffs' notice could be perceived as judicial endorsement of action, and statement that court took no position on case was insufficient because it was "seemingly tacked onto the end of the notice").

Third, Plaintiffs' proposed form fails to advise putative class members that, if they choose to opt-into the litigation, they may be required to sit for depositions and/or testify in court.  Such a disclosure is necessary for putative class members to make informed decisions as to whether they desire to join in the litigation and is commonly included in notice forms.  *See, e.g., Schwed*, 159 F.R.D. at 379 ("While the suit is proceeding, you may be required to provide information, sit for depositions, and testify in court.").

Fourth, the notice period should be limited to thirty days.  Many reported decisions afford opt-ins 30 days or less from the date of the court's order or from the date of mailing for returning the consent forms.  *See, e.g., King*, 1986 WL 2628, at *6 (30 days from the date of mailing); *Allen*, 93 F.R.D. at 449; *Watkins v. Milliken & Co.*, 613 F. Supp. 408, 420 (W.D.N.C. 1984)

(denying notice and ordering that all consent forms be filed within 30 days of the order); *Johnson v. American Airlines, Inc.*, 531 F. Supp. 957, 961 (N.D. Tex. 1982). ("The Court believes that a 21 day response time from the date of transmittal of the notice is the most reasonable, simple to administer, and appropriate in light of Plaintiffs' own delays in filing the present motion."); *Held v. Nat'l R.R. Passenger Corp.*, 101 F.R.D. 420, 423 (D.D.C. 1984) ("no later than thirty days from the [date] of this order").

Fifth, Plaintiffs' proposal to send the putative class members a "reminder notice" is inappropriate. Receipt of the initial notice form alone is sufficient to notify any potential class member of his or her opportunity to opt-in. *See Barnwell v. Corr. Corp. of Am.*, No. 08-2151-JWL, 2008 U.S. Dist. LEXIS 104230, at *28 (D. Kan. Dec. 9, 2008) (denying plaintiff's motion for an order permitting the mailing of a reminder postcard to potential collective class members 30 days before the deadline because "the notice itself is adequate to advise potential class members of their right to opt-in as plaintiffs in this case"). Potential opt-ins dedicated to and interested in pursing the alleged misclassification claim will join this action after receipt of the initial notice. Michigan Bell further objects to the mailing of a reminder notice because soliciting a potential client, who has remained silent after receipt of the initial notice, may violate the Michigan Rules of Professional Conduct. *See* Mich. Rules of Prof'l Conduct R. 7.3(b)(1) ("A lawyer shall not solicit professional employment . . . if . . . the prospective client has made known to the lawyer a desire not to be solicited by the lawyer).

Finally, in the event that Michigan Bell must produce the requested list of OSP Managers, Defendant will provide a list, in an agreeable format, of all persons employed by Defendant as an OSP Manager within three years of the Court's Order and up to May 16, 2009. Michigan Bell will further consent to providing each employee's identification number and their

25

approximate dates of employment in the OSP Manager job key, with the understanding that

additional discovery could refute the information.  Defendant, however, requests ten (10)

business days from the date of the Court's order to produce this list.

## IV.    CONCLUSION

Plaintiffs' motion for conditional certification should be denied.  They have failed to

meet their burden of demonstrating that the disparate putative class members are similarly

situated for the purpose of granting conditional certification and notice under the FLSA.


Dated:  February 22, 2010                    /s/ Kenneth W.  Gage_____
                                             Kenneth W. Gage, IL Bar No. 6291335
                                             Leslie A. Dent, GA Bar No. 218566
                                             Stacey Bentley, GA Bar No. 302929
                                             PAUL, HASTINGS, JANOFSKY & WALKER LLP
                                             191 North Wacker Drive, 30th Floor
                                             Chicago, Illinois  60606
                                             Tel:   (312) 499-6000
                                             Fax:  (312) 499-6100
                                             E-Mail:  kennethgage@paulhastings.com

                                             Albert Calille, MI Bar No. P26819
                                             AT&T Michigan
                                             444 Michigan Avenue, #1750
                                             Detroit, MI  48226
                                             Tel:  (313) 223-0964
                                             Fax: (313) 223-0892
                                             E-Mail:  ac2812@att.com

                                             Counsel for Defendant
                                             Michigan Bell, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of February, 2010, I electronically filed

DEFENDANT MICHIGAN BELL'S MEMORANDUM OF LAW IN OPPOSITION TO

PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION with the clerk of the Court

using the ECF system which will send notification of such filing to the following:

> Paul J. Lucas
> Matthew H. Morgan
> Timothy C. Selander
> NICHOLAS KASTER, PLLP
> 4600 IDS Center
> 80 South Eighth Street
> Minneapolis, Minnesota 55402

> /s/ Kenneth W. Gage
> _____
> Kenneth W. Gage
> PAUL, HASTINGS, JANOFSKY &
> WALKER LLP
>
> 191 North Wacker Drive
> Chicago, Illinois 60606
> Telephone:   (312) 499-6000
> Facsimile:   (312) 499-6146
> E-mail:  kennethgage@paulhastings.com
>
> Attorney for Defendant
> Michigan Bell Telephone Company